We have the benefit of Judge Darrow sitting with us today from the District Court and we're ready to proceed. First case is Rivera v. Allstate Insurance. Mr. Heineke? Good morning. May it please the Court, my name is Rex Heineke. I'm here on behalf of the defendant and appellate Allstate. Plaintiffs have two claims in this case, one for defamation and one for violation of FCRA, the Fair Credit Reporting Act. I'd like to turn first to the defamation claim and begin with the issue of special damages. Special damages are out-of-pocket economic losses. In a liable per quote case, this is a liable per quote case, a plaintiff must prove that the special damages were caused by the defendant's failed to prove that and therefore the defamation award should be reversed. We begin with Continental Nut which is a decision by this Court involving liable per quote and the proof of special damages when there's been a trial. In that case, this Court reversed the, or affirmed the reversal I should say, of the jury's verdict because the plaintiffs in a per quote case failed to put on any evidence that any customer in that case had seen the defamatory statements and refused to deal with the plaintiff there buying nuts, refused to buy nuts from the plaintiff because of the defamatory statements. We believe that Continental Nut is controlling here. There, there was a defamatory letter about the plaintiff's nuts. The plaintiff was in the business of selling nuts. Seven or eight of the plaintiff's customers saw the letter and at least three of them after reading the letter did not buy from the plaintiff. In addition, another 140 of the plaintiff's customers over the two years after the publication of the letter did not buy from the plaintiff. The plaintiff's profits decreased, the plaintiff's sales decreased, the defendant's sales increased, and the defendant's profits increased. But the plaintiff called no customers to testify about why they did not do business with the plaintiff. Similarly here, the plaintiffs called no employers to testify why they did not employ the plaintiffs. In Continental Nut, the plaintiff offered no evidence that any customer stopped doing business with the plaintiff because of the letter. Here, the plaintiffs offered no evidence that any employer refused to hire them because of the allegedly defamatory statements. Well, the argument in response is that that category of evidence is not strictly necessary and it would be implicit in this case based on the nature of the market for analysts of this caliber that the causal link is there. And so the line of cases that requires concrete testimony from customers or clients or employers is inapplicable here. Yes, Your Honor. That's certainly what the plaintiffs are contending. But we would respectfully submit that there is no authority for that proposition and that it would completely change the law of liable per quote because the law of liable per quote is that you must prove special damages with specificity that they are not to be implied but must be directly proven, as this Court said in Continental Nut. And that's what wasn't done here. If this were a liable per se case, the situation might be different. But in a liable per quote case, to ensure that people knew about the defamatory statements and relied upon them in their actions, the law requires that there be a showing of special damages and that those were the result of someone knowing about the defamatory statements and then acting based on the defamatory statements. So there is no, we submit, authority to the rule of the common law that has existed for, I'm not sure exactly how long, but an awfully long time. And it's in the end to protect free speech. What it does is ensure that when a statement is not defamatory on its face, to guarantee that there was damage to the employers who say, I did not hire the plaintiff, I did not buy from the plaintiff because I saw the defamatory statements and that caused me not to deal with the plaintiff. And that I submit, in fact, is corn book law. What the plaintiffs want to rely on is inferences that because the statement was published, allegedly defamatory statements here were and they didn't get jobs. Therefore, that must have happened because of the defamatory statements. But that's precisely the reasoning that this court rejected in Continental Nut. There, the plaintiff said, customers read this letter, customers stopped dealing with the plaintiff, a whole lot of other, that was three customers, 140 other customers stopped dealing with the plaintiff after the publication of the letter, but no one came forward and testified that the reason they stopped dealing with the plaintiff was because of the letter. And therefore, this court affirmed the reversal of the trial court's judgment. I think what's instructive here is what this court said in Continental Nut. Quote, the striking fact about the record in this case is that the plaintiff has not produced the testimony of a single customer or former customer. What is striking in this case is the plaintiffs have not produced a single recruiter or a single employer who says, I saw the allegedly defamatory statements and I wouldn't hire the plaintiffs because of those statements. That is fundamentally what is required by the law in a liable per quote case and nobody disputes that that's what this case is. So we submit on that basis alone, the trial court's judgment as to the defamation claim should be reversed. I have some questions about the FCRA claim. Certainly, Your Honor. What does this case have to do with credit reporting? It doesn't have much to do with credit reporting at all. For better or worse, Congress has broadened, I think, FCRA to cover things that are not necessarily credit reporting. Through that definitional section? That's what it appears to be. I mean, my own reaction is when I saw this case, I didn't understand why this was a FCRA case. I don't think it is. Because I didn't see what was the fair credit reporting. There's no credit being reported upon. Right. This is a regulatory scheme that operates on credit reporting agencies and requires reasonable procedures and disclosures and so forth. I think this would radically change employment law if it applied here. Right. That definitional section cannot possibly be a freestanding employment relations requirement that any time an employer does an investigation of misconduct on the job and disciplines the employee, whether by firing or some other discipline, there's a requirement to provide a written summary. Summary. Right. That can't possibly have been smuggled into the law by virtue of an exception to an exception within the definitional section of the FCRA. And I think all employers and employees would be startled to learn that they are in violation of FCRA. Because I don't think employers in the United States believe they have a legal obligation to provide a summary to every employee that they terminate. Was this- I don't think legal employers do that. Was this litigated? No. I don't think it was heavily litigated in the trial court, Your Honor. Then is the argument waived? Well, Your Honor, I think it's something on the face. It's a legal argument. It doesn't require the showing of any facts. And I think the court can, therefore, hear or decide that issue based on this record. Because it's a legal question, neither side would have been able to present any kind of facts that would have changed the outcome. Right. This is not a factual dispute. It's a question about whether this law covers this situation. We're not talking about information that was reported to an employer about a consumer's credit and caused the employer to take some adverse action. That's the only context within this regulatory scheme where the employer has some responsibilities. As I understand the statute in its totality, that employers can't pull a credit report and rely on it to discipline an employee without providing the employee with a summary of what's in the report and what, I mean, that's the employment angle on FCRA. Nothing beyond that, as I understand it. And if you actually trace through the definitions, including subsection Y, which is what the plaintiffs rely on here, we're talking about adverse actions based in whole or in part on a communication described in paragraph one, which is a consumer report. Right. Well. Judge Doe? I think she answered my question. All right. I think we need a brief. We've got a jury verdict here on a subject that the law doesn't cover. Right. Well, we'd be happy to do that. I see that I'm now eating into my rebuttal time, so unless the court has any other questions, I'll save the rest for rebuttal. Thank you. Thank you. Mr. Brody? Thank you. May it please the court. The district court in this case did not commit any legal error. We are here reviewing a jury verdict, and in my opponent's argument, I heard the word jury mentioned once, and that was only describing another case. Here, there is no challenge to a legal ruling, the instructions, for example. This is a case about the sufficiency of the evidence. The case was tried to a jury, which rendered a general verdict. There was no request for a special verdict. who declined to employ my clients. At the end of the trial, the jury found four of the plaintiffs, and that finding is entitled to deference in this court, and may only be upset if there is no evidence, no evidence to support the verdict, and yet here there is ample evidence. Viewing the evidence and all the inferences in favor of the plaintiffs, this court should affirm because there is ample evidence to support the verdict. Actually, there isn't any evidence of special damages to the requirements of Illinois law, which require a causal link, not just correlation. Correlation is not causation, as the saying goes, and the fact which, I mean, there's ample evidence that your clients were unable to get employment, but, and that correlates with the time period of their termination and the time period of the 10-K, but that's not enough under defamation law. Well, Your Honor, I disagree with that statement of the law, and let me take you through the cases. Let's start with LeSean, a 2010 case of the Illinois Appellate Court speaking to Illinois law. The plaintiff in LeSean was very much like my plaintiff. He was someone who had been terminated from his employment and was unable to find additional work. He sought damages under a per se theory, and also he sought special damages. The evidence he had supporting his claim for damages was that he was unable to find work and that a headhunter said, not that he was unable to place him, but that someone with this set of him would have difficulty finding work. In our case, we have that evidence and more, which I can go into. But what the Illinois Appellate Court said was that was sufficient. The court said that the plaintiff did not, the defendant in that case, like the defendants here, argued that the plaintiff had to come forward with specific proof of jobs lost, and the Illinois Appellate Court rejected that claim. They said the plaintiff did not rely solely on the presumption of damages, but also presented proof of damages, which the court found sufficient to affirm a $2 million compensatory special damage award. What was that proof? It was the plaintiff's testimony as to his inability to find work, and the testimony of a headhunter in the field saying someone of whom this was said would have difficulty finding work. We have the same here. Each plaintiff testified as to their own job search. Mr. Rivera, qualified as an expert, testified as to the impact of statements such as these on someone seeking a first quartile job to find subsequent employment. We also had additional testimony. We had the Graham testimony. We had the testimony about the communication networks. We had the testimony through the plaintiff's, excuse me, the defendant's expert about the impact of stigmatizing statements and how they persist. If it was so obvious, and the job search by the plaintiffs cast such a wide net within the relevant market, why wasn't there the testimony from a single prospective employer? Well, two reasons. First, Illinois law doesn't require it. Well, let's just assume that it does, okay? And here's why Illinois law shouldn't require it. It would be an unrealistic rule in a case like this where our clients sought employment generally to find those people generally in the market who chose not to hire them. They don't know why the phone didn't ring. They don't know what person would have hired them but chose not to because they saw this. But they claimed on the witness stand to know intimately the relevant market, and so it seems to me that a modicum of investigation would produce some witnesses who said, Yeah, I knew they were available and I didn't hire them because of the 10-K. Well, I think aside from my legal point, which I'll try to come back to in a moment, I think that's an unrealistic factual rule. In a defamation claim? Yes, Your Honor. Especially with the privilege associated with the requirement, the regulatory requirement to report in a 10-K? Privilege only helps them on actual malice, and as to actual malice, there's ample evidence that Allstate knew that this was false. Well, what's the chronology on that? When did the Department of Labor letter, when was that sent? The briefing was surprisingly missing that detail. It bookended the 10-K. The first DOL letter was in January of 2010. The 10-K was in February of 2010. The second DOL letter was in October of 2010. I'm talking about the one with the information about how the modeling, the economic modeling that produced the $91 million estimate was not reliable. I'm not sure if that was in the first letter or the second letter, Your Honor,  because Allstate was involved in directing the actions of NERA. When NERA, Allstate didn't need to wait until after the Department of Labor was advised what NERA had done. Allstate knew what NERA had done because they told them to do it. So Allstate knew when NERA came back with their conclusions, what it was based on and how it was faulty.  So Allstate has a bad case on actual malice, Your Honor, and the jury so found. But if I can return to the legal point, the law here is a question of Illinois law. And Illinois law is stated in the cases that we cite, almost all of which post-date Continental NUT, and I'll speak to Continental as well. And the legal principle, I think, is best stated in the Imperial Apparel case. That is a case where a generally broadcast defamation, such as this one, damaged the plaintiffs. And the court in Imperial Apparel, dealing with this argument, focused on context and said the nature of the proof needs to be as specific as it is reasonable to require. And the cases can apply that principle generally. When the defamation speaks to a particular lost opportunity, as in Continental NUT, the plaintiff need come forward with evidence as to that particular opportunity. Where it's generally broadcast, such as in Imperial Apparel or LeSean or Tonka, all cases in which special damages were allowed despite lack of evidence as to the particular customer, referring doctor, or so on lost, then a general statement gives rise to a claim such as ours. But without that kind of testimony, specific testimony from potential employers or a headhunter that wasn't present in this case, how do we know if these generalized concerns expressed by the plaintiff's trial about why they weren't hired were because of the statement itself or because they were terminated from Allstate or some other reason? Well, first I'd say that's a factual issue committed to the jury's discretion. But why was the jury's conclusion here reasonable? The factual evidence indicated that after the termination, but before the statement, my clients had greater access to assistance from, in this case, the sell-side brokers who get the word out and spread news of opportunities, and that when the 10-K was published, things got worse. They testified that it became tough for them after the 10-K was published. And to impose upon the plaintiffs in that circumstance the obligation to find a witness who would say, a witness unknown to the plaintiffs, who would say, well, you know, I was thinking about hiring for a job. I didn't post the job. These are not run-of-the-mill portfolio manager positions. They are senior portfolio manager positions that are often filled by employers seeking out employees, not the other way around. How about the headhunters who no longer were willing to work with them? Well, there's testimony from Ms. Graham as to that fact, and there's a question as to whether there's a hearsay issue. That was waived. So there's that evidence as well. So we have the expert proof from Mr. Rivera, the circumstances of the plaintiffs, the testimony of Ms. Graham's about face, the testimony of the sell-side brokers about face, and that is sufficient under the law of LeSean, Imperial Apparel, Tonka, and so on. Continental Nut is the case the plaintiffs rely on, and it's a case they didn't cite in the trial court until they got to the reply brief on post-trial motions. We cited it and explained why it wasn't relevant. And in Continental Nut, the plaintiff complained that he lost particular customers. The customers weren't called, and the plaintiff, when he testified, did not put in evidence of his loss. There are two elements of special damage. One is damage, and the other is causation. In Continental Nut, there was a failure to show damage. Here, damage was shown. Even the defendant's expert conceded that the compensatory damages were $11 million. The issue was one of causation. Yeah, that wasn't a liability causation opinion. No, I understand that, Your Honor, and I'm using this point to explain why Continental Nut stands for a slightly different proposition, and its causation ruling applying the direction of the Illinois courts should be limited to the context addressed in Continental Nut. In Continental Nut, this court said, we're riding on a clean slate. There is no Illinois law telling us what to do here, and this is what we think, said this court in the 1968 Continental Nut opinion. Since then, the Illinois courts have filled in the blank spots of Illinois law, and LeSean, Imperial Apparel, Tonka, and the other cases that we cite demonstrate the importance of context. Let me address one other argument about damages, and then address Judge Sykes' concern about FCRA. Plaintiffs and, excuse me, defendants in the reply brief suggest that this argument that we couldn't call the witnesses, call as witnesses people who didn't employ us because we didn't know who they are, is a new argument. That's not correct. We raised much the same argument in the post-trial motions. Ms. Meacock testified that she had previously been recruited through people calling her, and that stopped. Other witnesses testified that they had been recruited in that manner. Mr. Rivera was recruited to Allstate in that manner. Mr. Kensinger provided similar testimony, and there was testimony that top-tier jobs such as these are often hired through word of mouth. They're not posted on a general website. So that is not a new argument. It was amply raised below and raised to the jury and supported by the evidence. Let me address the FCRA point that Judge Sykes raised. Our argument is based on the language of the statute. It's a statutory argument. Communications include communications made of suspected employment, a suspected misconduct relating to employment, and subsection Y2. Only if made in a consumer report or in the context of consumer reporting. In the context of a communication, Your Honor. I don't think that's correct. This is not a general employment relations statute, and stretching it to cover this case would be an extraordinary shock to employment relations. It doesn't cover this. I'm just stunned that this point has been completely overlooked by everybody. Well, if this point is overlooked, Your Honor, then I would use a different word and I would say this point has been waived. I get that. But who do you get to decide? We're here now on appeal, and to write a decision saying this is a perfectly fine application of this statute would just commit us to a legal error that has substantial consequences. I'd be perfectly fine with Your Honor's writing an opinion saying that this point has been waived by the defense, and that would result in the same outcome. Fair enough. But this is not a point on which we are out crying in the wilderness. The regulators in 2002 issued an agency interpretation saying it covered this. In the Bush administration, they issued a new agency interpretation saying it covered this. This definitional section creates a freestanding regulatory requirement that whenever an employer does an investigation of any kind into misconduct on the job and takes an adverse action, any kind of discipline, any kind of termination, there's an obligation to provide a summary of the communications that passed between the employer and the investigators? Your Honor, I'm not. I cannot believe that that's what any of the background guidance stands for. Your Honor, I'm not. I didn't look at it in depth, but that would shock me. Well, given that this has been raised, I haven't looked at it in depth either. But I do know that the agency, both in 2002 and then repeated under the Bush 43 administration, reiterated the same guidance but limited it not to all the communications but just to a summary, which is the basis for our claim that we were entitled to a summary. Right. The only employment aspect to the FCRA is that when a credit report is pulled in the context of employment, the employer, and there's something bad in the credit report that results in an adverse action, the employer has to notify the employee and give the summary. It's wholly in the context of communications in credit reports. I understand the contextual argument, but the plain language of the statute speaks of the employer. Well, actually, if you trace that through, the subsection Y, which is what the claim is premised on, requires that the communication be a consumer report. If you trace it back, subsection 2, which is the one you rely on, after taking an adverse action based in whole or in part on a communication described in paragraph 1, paragraph 1 says that it's got to be a consumer report. I'm in Y1A, which says consumer report. Y1B says the communication is made to an employer, which in this case was Allstate, in connection with an investigation of suspected misconduct relating to employment, which is what we have. It's conjunctive. It has to be a consumer report and communications made to an employer in connection with a consumer report having to do with credit worthiness, credit standing, credit capacity, and et cetera. It's all conjunctive. It has to be all of those things in order to qualify. I'm not sure I agree with you, Your Honor, and I'm relying on the administrative guidance. But, again, this is an argument not raised. But it is the tail that's wagging the dog of attorney's fees in this case. It is. There is an award of attorney's fees that would be implicated by that and the $3,000 award to each plaintiff. Yeah, that's minimal compared to the compensatory damages award, but it supports the attorney's fee. It does, Your Honor, and I understand that point. And if Your Honor would like us to provide supplemental briefing on the application, we can. You suggested that in the case. We'll let you know. We'll talk about it. Okay. But on the issue of libel, which is where this case begins and I think where the damages greatly rest, the case is constrained by Illinois law. Illinois law permits the recovery of compensatory damages in circumstances where the context permits a reasonable recovery and permits a reasonable conclusion as to causation. In case after case, such as imperial apparel, where there was no evidence of a lost customer, or in Tonka, where the plaintiff was allowed to recover for lost referrals about doctors who did not testify, about doctors for whom there was no testimony that the doctors even heard the false statement, or in Leshan, where the plaintiff was allowed to recover substantial damages in excess of general reputational damages based on evidence that is less robust than the evidence in this case, Illinois law would support the recovery of a libel judgment in this case. This is libel per quad. So the element of damages is satisfied. The evidence of oven concerning the plaintiffs is satisfied. The plaintiffs rely in, excuse me, the defendants rely in their reply brief on the Latimer case. That is a per se case. In a per se case, the plaintiff cannot go beyond the four corners of the complaint. In a per quad case such as this, they can. That completely distinguishes the case because our evidence that the defamation was oven concerning the plaintiffs flows from things beyond the four corners of the 10-K, as is permitted. Substantial truth, the jury found that this was false. The jury found it was false based on evidence. Let's just start with the plaintiffs who testified it was false. That's sufficient to uphold the verdict. Finally, on the malice point, which Judge Sykes raised in connection with the privilege, we do have an obligation to meet the requirement of constitutional malice. That was amply demonstrated here by evidence that Allstate had before it, evidence that it knew that what it was saying was false. Allstate knew that this supposed Dietz-motivated trading was going on throughout Allstate. It was going on in their fixed income branch, but they chose not to investigate that and instead published something blaming on the equity group, something that was the duty of all of Allstate. My time is up. Thank you for your attention, and I invite the court to affirm the judgment below. Thank you, counsel. How much time? Nine minutes. Thank you. I'd like to turn to the three cases that the plaintiffs rely on here, on special damages, because I think if you examine those cases, you'll see that they do not support the plaintiff's case. First, they rely on imperial apparel. In that case, the ads were in a major newspaper. Two competitors, one published ads about the other. What the court said was, where there's a wide dissemination to persons unknown and plaintiff sells to the general public, you don't have to bring in specific customers and say, I didn't purchase because of this. But what are the facts here? They are completely different. Plaintiffs knew the identity of employers. They sent out hundreds of resumes to employers. They also had interviews with employers and then said, we didn't get hired after the interviews. So they knew who these employers were. They knew the identity of employers who they say were not hiring them because of the defamatory statements. Therefore, imperial apparel has no application because it's a case about selling to the general public, not selling to people whose identities you know. Second, they rely on the Tunka case. There, the court said that special damages had adequately been pled. Why did it say that? It said that they'd been adequately pled because the plaintiff doctor who'd been accused of malpractice  had not referred patients to him. So as a matter of pleading, the court said, when you name a specific doctor who's not referring patients to you, then you've met the special damages requirement. That's the problem plaintiffs have here. They didn't have anybody like that. Lastly, they rely on the LeSean case, which is the one that they emphasize most today in oral argument. But if the court looks at that case, it will see that it says twice this is a liable per se case. It is not a liable per quote case, and therefore it's ruling on recovering special damages, i.e. out-of-pocket economic losses, in a per quote case. It has no application because it's not a per quote case. It's a liable per se case. Plaintiffs then say, well, we also had this recruiter, Graham, and therefore, because of Graham, we put on enough evidence. We submit that's incorrect. Why? One of the plaintiffs had this recruiter, Graham. Mia Cox, she testified that after the 10K came out, Graham stopped submitting her resume to employers. What she did not say is why Graham stopped submitting the resume. Was it because she wasn't getting paid? Was it because she wasn't getting along with this person? Was it because she got out of the business? Who knows what the reason was? And plaintiffs put this person on their list of witnesses and then didn't call her. So they had no evidence as to why that recruiter stopped dealing with this plaintiff. It's, again, the correlation that they rely on rather than causation. Recruiter dealt with me. 10K comes out. Recruiter does not deal with me. And on that correlation, they say they've met the requirements of Continental NUT and the other Illinois cases, because it's not only Continental NUT that says this. We list a whole bunch of other Illinois cases that say the same thing. Correlation is not causation. What they failed to prove here was causation, and that dooms their special damages case. Unless the court has further questions, thank you for listening to the argument. Thank you, counsel. Thanks to both counsel in the cases taken under advisement.